Schuyler G. Carroll
David N. Wynn
Mark A. Angelov
ARENT FOX LLP
1675 Broadway
New York, NY 10019
(212) 484-3900

Attorneys for Park Avenue Radiologists,
  PC, *et al*., Reorganized Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PARK AVENUE RADIOLOGISTS, P.C., | : | Case No. 09-14929 (MG) through |
| *et al.*, | : | 09-14931 (MG) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |

--------------------------------------------------------- x

| | | |
|---|---|---|
| PARK AVENUE RADIOLOGISTS, P.C., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. Proc. No. _____ |
| | : | |
| JOHN MELNICK, M.D., | : | |
| | : | |
| Defendant. | : | |

--------------------------------------------------------- x

## COMPLAINT

Park Avenue Radiologists, P.C., ("Park") as and for its complaint in this adversary

proceeding alleges as follows.

## NATURE OF ACTION

1.      Park is a medical practice located at 525 Park Avenue, New York, New York.  It

employed defendant John Melnick, M.D. ("Melnick" or "Defendant") under a multi-year

employment contract with a restrictive covenant prohibiting post-termination employment within a specifically defined area of approximately 1¼ mile radius of Park. Melnick resigned from the practice and began working for a competing radiology practice in violation of his restrictive covenant.

2.     Park brings this adversary proceeding because Melnick not only violated his restrictive covenant but initiated a pattern of wrongful and harmful acts directed to Park and its affiliated entities. Melnick's wrongful conduct was designed to inhibit, if not outright prevent, Park's successful re-organization by destroying its valuable referral sources, which are the lifeblood of any successful radiology practice. Melnick's wrongful acts included, but are not limited to, the following:

> (i)     Melnick resigned secretly from Park to Dr. Messina (its former majority shareholder) simultaneous with the time Dr. Messina sold all his interest to Dr. Liebeskind (its current 100% owner), and then concealed his resignation while feigning being a loyal employee of the practice. During this time, Melnick committed numerous acts of sabotage directed to Park and its affiliated entities.

> (ii)    During the period following Melnick's clandestine resignation – but while he was still working for and getting paid by Park -- Melnick agreed to work for his new employer, a medical practice located in a geographic area barred by his restrictive covenant.

> (iii)   Also during that period of time and thereafter, Melnick not only had access to but actually used Park's confidential information. To that end, Melnick contacted Park's referral physicians and defamed and disparaged Park. The

- 2 -

false and defamatory statements made by Melnick included telling Park referral sources that Park could not re-organize, its owners committed fraudulent and illegal acts and that if referrals continued sending patients to Park, their patients would suffer a loss of continuity of care and referral physicians would lose access to medical records and scans needed for future diagnosis and treatment.

3.     Park brings this adversary proceeding to enjoin Melnick from violating his restrictive covenant and to recover damages, *inter alia*, for breach of contract, breach of fiduciary duty and other tortious acts committed by Melnick to sabotage Park's efforts to re-organize and emerge from bankruptcy.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5.     This adversary proceeding has been referred to the Court pursuant to 28 U.S.C. § 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.) dated July 10, 1984.

6.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(F),(H) and (O).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409, as this proceeding arises in and relates to a case under the Bankruptcy Code pending in this District.

## THE PARTIES

8.     Park is a professional corporation practicing medicine at 525 Park Avenue, New York, New York.  On August 11, 2009, Park filed for bankruptcy in this Court under Case

- 3 -

Number 09-14929 (MG through 09-1431 MC Jointly Administered), together with two affiliated companies Imaging Services Company of New York, LLC. ("Imaging") and MLLH Realty Corp. ("MLLH," and together with Imaging and Park, the "Debtors"). The three bankruptcies were jointly administered and each Debtor entity emerged from bankruptcy pursuant to a plan of reorganization confirmed by this Court on August 26, 2010 and made effective in November 2010.

9.       John Melnick, M.D. ("Melnick") is a licensed physician who resides in New York, New York. Melnick was employed by Park from July 2004 until March 12, 2010 when he voluntarily resigned from the practice. He works for Lenox Hill Radiology and Medical Imaging Associates, P.C. ("LHR"), located on East 77th Street, where he holds himself out as "Medical Director."

## FACTUAL BACKGROUND

10.      On or about March 12, 2004, Melnick entered into a written employment agreement with Park, as amended on or about June 30, 2006 (the "Employment Agreement").

11.      Under the Employment Agreement, Melnick was to devote his full time private practice activities performing radiology services for Park.

12.      The Employment Agreement contemplated an initial five year term, beginning on July 7, 2004.

13.      During the initial five year period, the Employment Agreement provided that either party could terminate the agreement on 50 days written notice, with Park able to terminate "for cause." After the five year term, "for cause" was narrowed to "gross negligence and unlawful and unethical behavior."

14.      In their Employment Agreement, the parties agreed to the following restrictive covenant:

- 4 -

"Restrictive Covenant
In the event that either party terminates this agreement after the second year of employment, it is agreed that you (Melnick) will not work north of 36th Street, south of 85th Street, east of Broadway below 59th Street nor east of CPW above 59th with the exception of positions at any teaching hospital within this area or obtaining and/or maintaining privileges at any hospital within said restricted area and performing all duties related thereto. This restrictive covenant shall not apply if the Practice terminates your employment without cause or if you (Melnick) terminate your employment for cause. Further, you agree to keep confidential any non-public information about the Practice and its operations that you may acquire during your employment."

15. Thereafter, the parties entered into an addendum to the Employment Agreement pertaining to the restrictive covenant. The revised restrictive covenant provided as follows:

"Addendum for the Restrictive Covenant
In the event that either party terminates this agreement after the second year of employment, it is agreed that for a 2 year period thereafter you (Melnick) will not work north of 36th Street, south of 85th Street, east of Broadway below 59th Street nor east of CPW above 59th with the exception of positions at any teaching hospital within this area or obtaining and/or maintaining privileges at any hospital within said restricted area and performing all duties related thereto. This restrictive covenant shall not apply if the Practice terminates your employment without cause or if you terminate your employment for cause. Further, you agree to keep confidential any non-public information about the Practice and its operations that you may acquire during your employment."

Collectively, the initial employment agreement and its addendum are attached at Exhibit 1 and referred to as the "Employment Agreement."

16. After the five year term, Melnick and Park continued their employment relationship such that Melnick continued to work at Park under the Employment Agreement.

17. Among the express terms of employment that continued after July 2009 was the restrictive covenant applicable to Melnick.

18. As described below, Melnick knew the restrictive covenant in the Employment Agreement applied to him after July 2009.

19.     While Melnick was employed at Park, a shareholder dispute arose between Marc Liebeskind, M.D. ("Liebeskind") and Albert Messina, M.D. ("Messina"), the two shareholders of Park and its affiliated entities.

20.     In June 2009, as a result of the Liebeskind/Messina dispute, while Liebeskind remained a shareholder and owner of Park, he began working at LHR, a radiology practice located on East 77th Street, New York, New York.

21.     In connection with the dispute between Liebeskind and Messina, Liebeskind and the estates of his parents (Arie Liebeskind and Doreen Liebeskind, who prior to their deaths were shareholders of the practice), obtained a judgment against Messina, Park and the affiliated entities.  Said judgment, entered by the Clerk of the New York State Supreme Court, New York County on June 3, 2009 ("the Judgment"), required Messina to cause the practice to pay Liebeskind and his parents' estates in excess of $10 million.  Said payments were due to be made on July 6, 2009.

22.     When Messina, Park and the affiliated entities could not pay the Judgment, Park and its affiliated entities filed for bankruptcy.

23.     During the course of the Park, Imaging and MLLH bankruptcies, Liebeskind and Messina endeavored to settle their long-standing dispute, which they did by agreement executed on March 12, 2010 and approved by this Court pursuant to Bankruptcy Rule 9019 on April 20, 2010 (the "March 12 Settlement").

24.     The essence of the March 12 Settlement was that Messina agreed, among other things, to resign from the practice and let his interests in Park and affiliated entities be redeemed in exchange for certain payment in 2010 and additional payments over time.  Also in accordance

with the March 12 Settlement, as of March 12, 2010, Liebeskind would operate the practice without Messina.

### MELNICK'S WRONGFUL CONDUCT

25.     After all terms and conditions of the settlement were finalized, Liebeskind executed the March 12 Settlement in the morning of March 12, 2010.

26.     The existence of the March 12 Settlement was known by Melnick.

27.     At or about the time that Liebeskind was executing the March 12 Settlement, Messina attended to his final business at Park, which included, among other things, saying farewell to Park's employees and staff, after which Messina went to the offices of Park's counsel to counter-execute the March 12 Settlement.

(i)     **Melnick's Efforts To Evade The Restrictive Covenant**

28.     In the days leading up to the March 12 Settlement, Melnick learned that Messina was to leave Park.

29.     However, Melnick did not want to work at Park if Messina was not remaining at the practice.

30.     Melnick knew he was subject to the Restrictive Covenant in his Employment Agreement.

31.     Melnick told Messina that he could not work with Liebeskind.

32.     Melnick asked Messina to release him from the restrictive covenant.

33.     Accordingly, on or about February 25, 2010, Melnick provided Messina a document to sign entitled "Addendum to Employment Agreement." The Addendum is attached hereto as Exhibit 2 and referred to as the "Addendum Agreement."

34.     The Addendum Agreement purports to be a release by Park in favor of Melnick from his contractual restrictive covenant.

- 7 -

35.     Melnick asked Messina to sign the Addendum Agreement because Melnick knew he was subject to a restrictive covenant and contractually prohibited from working in certain areas of Manhattan, including at LHR.

36.     Messina executed the Addendum Agreement on February 25, 2010.

37.     Messina executed the Addendum Agreement after the filing of Park's bankruptcy petition.

38.     Messina did not ask for, and Melnick did not offer, any consideration for the Addendum Agreement.  As a result, Park did not receive consideration for the Addendum Agreement.

39.     A release in the form of an Addendum Agreement was not a transaction in Park's ordinary course of business as Park had never previously released any employee, let alone a physician employee, from his or her restrictive covenant.

40.     The Addendum Agreement was not presented to Park's counsel for review and consideration.  Nor was the Addendum Agreement disclosed to anyone other than Messina and Melnick.

41.     As such, the Addendum Agreement was never submitted for approval by the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the reorganization of Park and its affiliated entities (the "Bankruptcy Court").

(ii)     **Melnick Violated The Restrictive Covenant**

42.     LHR is a medical practice within the geographic area prescribed by the restrictive covenant contained in the Employment Agreement.

43.     Prior to March 12, 2010, Melnick began negotiations with LHR to become LHR's full time physician employee.

- 8 -

44.     Melnick and, upon information and belief, LHR, knew Melnick's Employment Agreement prevented him from working at LHR for two years after Melnick left Park.

45.     Melnick began working at LHR no later than April 5, 2010.

(iii)     **Melnick's Work At LHR Breaches His Employment Agreement**

46.     Melnick's work at LHR was wrongful for multiple independent reasons.

47.     First, Melnick intentionally sought to work in close proximity to Park so he could destroy and/or steal Park's valuable and longstanding referral relationships.

48.     An integral component of Melnick's plan to destroy and/or steal Park's referral network and otherwise injure Part was to work at LHR, in contravention of his contractual restrictive covenant.

49.     Melnick's employment at LHR was at its 61 East 77th Street address, a prohibited location.  The work location is referenced by the draft announcement produced by Melnick pursuant to an order granting Rule 2004 examination of Melnick entered by the Bankruptcy Court.  A copy of the announcement is attached as Exhibit 3.

50.     LHR later disseminated an announcement to the public and the medical community that confirmed Melnick began employment at LHR's offices on East 77th Street.

51.     Melnick's job responsibilities at LHR also included the position of LHR Medical Director at its East 77th Street office.

52.     Melnick's employment at LHR violates his restrictive covenant and constituted a breach of the Employment Agreement.

(iv)     **Melnick's Acts Were Tortious and Harmful to Park**

53.     Second, Melnick owed fiduciary duties to Park.

54.     Prior to and after his departure from Park, Melnick acted in a malicious manner designed to injure Park and its affiliated entities.

55.     Melnick also knew that Park and its affiliated entities needed to retain its existing referral network or the reorganization would be delayed if not entirely frustrated.

56.     Melnick also knew the restrictive covenant was a valuable asset of Park that was required to preserve and maintain its referral network and safeguard use of confidential practice information.

57.     Melnick, acting in concert with others, conspired to injure Park by evading the restrictive covenant and destroy and/or steal Park's referral network in order to hinder, delay or prevent a successful re-organization of the Debtors.

58.     Specifically, as an employee of Park, Melnick had access to Park's confidential information, including information pertaining to the network of Park's referral physicians and knew that Park received significant revenues by performing medical services to a particular labor union, which services often yielded monthly receipts in excess of $200,000.

59.     Melnick also knew that the union medical services provided critical cash flow that was needed for Park to operate in Chapter 11 pending reorganization.

60.     For example, from September 2009 to March 2010, monthly receipts from union medical services ranged from between $140,000 and $220,000, which represented between 30-40% of Park's monthly collections.  As alleged below, due to Melnick's wrongful activity, the monthly union receipts fell to approximately $38,000 by July 2010.

61.     Collections from the union provided the necessary cash flow to allow Park and its affiliated entities to operate and avoid a Chapter 7 liquidation.

62.     When Melnick discovered Messina's intent to leave Park, Melnick embarked on a clandestine scheme to destroy Park and force it into liquidation.

63.     Melnick's plan, which was undertaken with individuals not presently known, focused on destruction of Park's relationship with the union and others in Park's referral network.

64.     For example, Melnick knew the union medical services consisted in large part of breast imaging work.

65.     Melnick knew that he and Messina specialized in this type of patient work, which was indispensable to maintaining Park's longstanding relationship with the union and other physicians referring patients to Park.

66.     Further, Melnick knew that after Messina left on March 12, 2010, Melnick would have responsibility for the union breast imaging work.

### (a)     Melnick's Secret Resignation

67.     At or about noon on March 12, 2010, immediately before Messina was to resign and execute the March 12 Settlement, Melnick tendered his resignation to Messina.

68.     Melnick told Messina he was "resigning for personal reasons."

69.     In submitting his written resignation to Messina, Melnick asked Messina to countersign his resignation letter.  A copy of the Melnick resignation letter, countersigned by Messina and dated and timed at noon on March 12, 2010 is attached as Exhibit 4.

70.     No copy of the Melnick resignation letter was placed in Park's files.  Upon information and belief, this was done at Melnick's request.

71.     Messina did not disclose to Liebeskind that Melnick had resigned.

72.     Similarly, Melnick did not disclose to Liebeskind, the Park office manager or anyone else at Park that he had resigned as of noon on March 12, 2010.

NYC/532033.8

73. In fact, Melnick's March 12, 2010 resignation letter was not known by Park, Liebeskind or the Debtors' counsel until the resignation letter was produced by Melnick pursuant to the 2004 discovery order in or about August 2010.

74. Not only did Melnick conceal from Park and Liebeskind his resignation, but he feigned being an active and loyal employee of Park.

75. To that end, by the time Melnick secretly resigned from Park on March 12, 2010, Melnick had agreed to work at LHR, a violation of his restrictive covenant.

76. In fact, by March 15, 2010, the next business day after the resignation, LHR's counsel possessed a nine page draft employment agreement for Melnick confirming his employment at LHR's East 77th Street location. Said draft agreement also was produced by Melnick in response to Park's 2004 discovery demand and is attached at Exhibit 5.

77. After March 12, 2010, Melnick continued to show up at Park until April 2, 2010.

78. Melnick continued to accept salary at Park until April 2, 2010.

79. Melnick continued to have access to Park confidential information.

80. Melnick continued to have unfettered contact with and access to Park's referral network until April 2, 2010.

**(b) Melnick Sabotages Park**

81. Third, while concealing his resignation, Melnick began to sabotage Park.

82. Melnick's wrongful acts included a work slowdown and an unauthorized multi-day absence from work designed to destroy Park's relationships with its referral network in general but the union in particular.

83. As to the work slowdown, Melnick created an unprofessional backlog of unread cases to the detriment of Park – but more importantly -- to the detriment of Park's referrals and patients.

84.     In that regard, Melnick failed to review and report patient cases at a normal and customary rate, which had the intended consequence.

85.     Melnick's conduct was intended to harm Park by causing the union and others to become dissatisfied with Park patient service so they would sever their longstanding relationships.

86.     Fourth, Melnick undertook other wrongful acts directed to Park, including soliciting Park employees to quit and seek employment at LHR.

87.     In total, Melnick solicited on behalf of LHR more than six Park employees, who resigned and followed him to LHR, a practice location at which Melnick could not work at due to his restrictive covenant.

88.     Fifth, still other wrongful acts included insubordination.

89.     One act of gross insubordination involved his multi-day unauthorized absence from work.

90.     Specifically, the very day in February 2010 Melnick asked Messina to execute the Addendum Agreement, Melnick booked a trip to attend a medical conference during the week of March 29, 2010.

91.     However, due to the Melnick-caused patient case backlog, Melnick was directed to cancel his attendance at the conference and work on backlogged cases, including the union mammography and other breast imaging work.

92.     In direct violation of the order, Melnick refused and attended the conference.

93.     Melnick's attendance at the conference not only constituted an act of gross insubordination, but exacerbated the patient case backlog and precipitated a further erosion of the union work at Park.

- 13 -

94.     The aforementioned tortious acts had a devastating impact on Park's cash flow and relationships with the union and other referring physicians.

95.     As to the union, for example, as alleged above, given 60 to 90 day normal collection cycle, by June 2010, the union monthly collections dropped to less than $65,000, which was followed by still lower receipts of $38,000 in July, $47,000 in August and $52,000 in September.

### (c)     Melnick Defames and Disparages Park

96.     But Melnick and others working in concert with him did not stop there.

97.     In that regard, Melnick and others not yet known disseminated to Park's referral network false statements about Park and its owner that were intended to disparage Park and cause the union and other physician referrals to stop sending patients to Park.

98.     Specifically, representatives of the union and others were told that Park could not re-organize and would not be in business much longer.

99.     Melnick, and others acting in concert with him, used words to the effect that Park and its owners were engaging in "fraudulent" acts and that if referrals continued to send patients to Park, patients would lose continuity of care and physicians would lose access to their patient records and medical files.

100.    Melnick's statements were false, known to be false and designed to injure Park.

101.    In summary, Melnick's conduct, including the work slowdown, the insubordination and defamatory statements were intended to destroy Park and create an environment whereby the union and other physician work could be poached by Melnick at LHR and LHR itself.

102.    Melnick acted in a wrongful, malicious and unethical behavior.

103.    Melnick's conduct caused irreparable injury to Park.

- 14 -

104.    Melnick has caused damages to Park that *inter alia* hampered Park and the affiliated entities re-organization, caused it to incur significant additional legal and financing costs and loss of practice revenue in an amount to be provided at trial, but not less than $2 million.

## AS AND FOR A FIRST CLAIM

105.    Park repeats and re-alleges all allegations in paragraphs 1 to 104 as if set forth at length.

106.    Since the Addendum Agreement was outside the ordinary course of business and not submitted for approval by the Bankruptcy Court, it is null and void and of no force and effect.

107.    Park lacks adequate remedies of law.

108.    By reason of the foregoing, Park seeks a declaration that the Addendum Agreement is null and void for multiple independent reasons, including (i) pursuant to 11 U.S.C. § 549; because it was not a transaction in Park's ordinary course and was not approved by the Court and (ii) because Park received no consideration.

## AS AND FOR A SECOND CLAIM

109.    Park repeats and re-alleges all allegations in paragraphs 1 to 108 as if set forth at length.

110.    Melnick's employment at LHR violates his restrictive covenant.

111.    Melnick's continued employment in violation of the restrictive covenant is causing irreparable harm to Park.

112.    Park lacks adequate remedies of law.

- 15 -

113.    By reason of the foregoing, Park is entitled to injunctive relief enjoining Melnick from working at LHR in violation of the restrictive covenant and further compelling Melnick to cease and desist employment at LHR or any other medical practice in violation of his restrictive covenant.

## AS AND FOR A THIRD CLAIM

114.    Park repeats and re-alleges all allegations in paragraphs 1 to 113 as if set forth at length.

115.    The Employment Agreement is a binding contract between Park and Melnick.

116.    The restrictive covenant contained in the Employment Agreement prohibited Melnick from working within a specifically enumerated geographic area following the termination of Melnick's employment at Park.

117.    LHR's office where Melnick works is within that specifically enumerated and prohibited geographic area.

118.    Melnick breached the Employment Agreement by being and continuing to be employed at LHR.

119.    Melnick's breach of the Employment Agreement caused injury to Park in an amount to be proved at trial, but not less than $2 million.

120.    By reason of the foregoing, Park seeks damages against Melnick in an amount to be proved at trial but not less than $2 million, together with attorneys' fees.

## AS AND FOR A FOURTH CLAIM

121.    Park repeats and re-alleges all allegations in paragraphs 1 to 120 as if set forth at length.

122.    Melnick owed fiduciary duties to Park.

123.     The aforementioned conduct was wrongful, intentional, and designed to cause injury to Park and its affiliated entities.

124.     Melnick breached his fiduciary duties to Park.

125.     Melnick caused injury to Park.

126.     By reason of the foregoing, Park seeks damages in an amount to be proved at trial in excess of $2 million, together with attorneys' fees and punitive damages.

<u>AS AND FOR A FIFTH CLAIM</u>

127.     Park repeats and re-alleges all allegations in paragraphs 1 to 126 as if set forth at length.

128.     Melnick knew of Park's contractual and referral relationships with the union and other physicians that sent patients to Park.

129.     Melnick intended to defame Park and interfere with and destroy Park's relationship with the union and other physicians that sent patients to Park.

130.     Melnick acted wrongfully.

131.     Melnick acted with malice.

132.     Melnick caused injury to Park in an amount to be proved at trial, but not less than $2 million.

133.     By reason of the foregoing, Park seeks damages against Melnick in an amount to be proved at trial but not less than $2 million, together with attorneys' fees and punitive damages.

<u>AS AND FOR A SIXTH CLAIM</u>

134.     Park repeats and re-alleges all allegations in paragraphs 1 to 133 as if set forth at length.

135.     Park seeks to avoid the Addendum Agreement which is avoidable pursuant to 11 U.S.C. § 548.

136.     Park received less than a reasonably equivalent value in exchange for the Addendum Agreement.  In fact, Park received no consideration whatsoever in exchange for the Addendum Agreement.  In addition, Park (i) was insolvent on the date the Addendum Agreement was executed or became insolvent as a result of Addendum Agreement; or (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Park was an unreasonably small capital; or (iii) intended to incur, or believed that Park would incur, debts that would be beyond Park's ability to pay as such debts matured; or (iv) executed the Addendum Agreement to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

137.     By reason of the foregoing, the Addendum Agreement is avoidable and recoverable under 11 U.S.C. §§ 548(a)(1)(B) and 550.

138.     By reason of the foregoing, Park is entitled (a) to a judgment setting aside the Addendum Agreement and (b) to recover the sum total of the value of the Addendum Agreement plus interest and attorneys' fees.

<u>AS AND FOR A SEVENTH CLAIM</u>

139.     Park repeats and re-alleges all allegations in paragraphs 1 to 138 as if set forth at length.

140.     Park seeks to avoid the Addendum Agreement entered into with the Defendant which is avoidable pursuant to 11 U.S.C. § 549.

- 18 -

141.    Park and the Defendant entered into the Addendum Agreement after the Filing Date.

142.    The Addendum Agreement was not authorized by the Bankruptcy Code in general, or by the Court.

143.    By reason of the foregoing, the Addendum Agreement is avoidable and recoverable by Park under 11 U.S.C. §§ 549(a) and 550.

144.    Accordingly, Park is entitled to a judgment setting aside the Addendum Agreement.

WHEREFORE, Park seeks a judgment as follows

(i)     On the first count, a declaration that Melnick's Addendum Agreement and release from his restrictive covenant is not binding and of no force and effect.

(ii)    On the second count, a preliminary and permanent injunction enjoining Melnick from working for LHR in violation of the restrictive covenant, and further compelling Melnick to cease and desist working at LHR or any other medical practice in violation from the restrictive covenant.

(iii)   On the third count, damages in an amount to be proved at trial, but not less than $2 million, together with attorneys' fees.

(iv)    On the fourth and fifth counts, damages in an amount to be proved at trial, but not less than $2 million, together with attorneys' fees and punitive damages.

(v)     On the sixth and seventh counts, setting aside the Addendum Agreement pursuant to 11 U.S.C. § 548, 549 and 550.

NYC/532033.8

(vi)     Such further and other relief as the Court deems just and proper.


Dated:   New York, New York
         December 21, 2010

                                   **ARENT FOX LLP**

                                   Attorneys for Park Avenue Radiologists,
                                   PC, *et al.*, Reorganized Debtors


                                   By:   */s/ Schuyler G. Carroll*_____
                                         Schuyler G. Carroll
                                         David N. Wynn
                                         Mark A. Angelov
                                         1675 Broadway
                                         New York, New York  10019
                                         (212) 484-3900

- 20 -